FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

09 JAN 15 PM 2:52

OFFICE OF THE CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BONNIE S. UHER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 4:07CV3215 |
| vs. ) | |
| ) | **MEMORANDUM AND ORDER** |
| MICHAEL ASTRUE, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

Plaintiff, Bonnie S. Uher, seeks review of a decision by the Commissioner of the Social Security Administration (SSA), denying her applications for disability insurance benefits and supplemental security income benefits.

After carefully reviewing the administrative record and the parties' written arguments, the court concludes that the SSA decision should be affirmed.

## I. PROCEDURAL BACKGROUND

This suit involves two applications made by the Plaintiff pursuant to the Social Security Act: (1) an application for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401 *et seq.* and (2) an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*

Both applications were denied initially and after reconsideration. After a hearing, an administrative law judge (ALJ) issued a decision on June 7, 2006, in which she found the plaintiff was not disabled, as defined in the Social Security Act and was not eligible to

receive Social Security disability benefits. On June 28, 2007, the Appeals Council of the SSA denied plaintiff's request for review, and the decision of the ALJ stands as the final decision of the Commissioner.

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

Plaintiff filed this action on August 27, 2007.

## II. FACTUAL BACKGROUND

The administrative record shows the following.

Plaintiff was born on February 1, 1964. At her hearing, the plaintiff testified that she graduated from high school and went to college for a little while, but did not complete any training. She originally alleged that she became unable to work on September 11, 2001, but amended her onset date to February 7, 2002. Plaintiff alleges that she has been unable to work for 40 hours a week on a sustained basis since February 7, 2002 due to "schizoaffective disorder, bipolar type." Plaintiff's past relevant work was as a cook in a restaurant and a nursing home.

Plaintiff began having recurrent episodes of mania and depression in the early 1990s. Her symptoms reportedly worsened following the birth of her son, and she has a history of three psychotic episodes that required inpatient treatment. Plaintiff's first a psychiatric

hospitalization occurred in January 1992 after her son was born. She was started on lithium at that time to regulate her mood swings.

A second psychiatric hospitalization took place at the Norfolk (Nebraska) Regional Center (NRC) from March 7 to April 1, 1997. Plaintiff was discharged with diagnoses of psychotic disorder, not otherwise specified and exogenous obesity. Plaintiff's Global Assessment of Functioning (GAF) was rated at 70 at the time of discharge. Plaintiff's treating staff psychiatrist, Loren Petersen, M.D., noted that Plaintiff was acutely psychotic on admission; however, upon discharge, Plaintiff's prognosis was considered hopeful because she had responded for four years without any medication and without a psychotic episode. Her psychotropic medications upon discharge consisted of Cogentin, Lithobid, and Stelazine.

On April 18, 1997, Plaintiff was admitted to the NRC Outpatient Program in the aftercare program with Diane Schumacher, PA-C, at the Crisis Preventions Program. She was discharged from the outpatient program on October 23, 2001 due to her readmission to inpatient care.

A psychotic episode occurred in late 2001, shortly before Plaintiff's amended alleged onset date. From September 27, 2001 through October 23, 2001, Plaintiff had a psychiatric inpatient hospitalization at Faith Regional Health Services. Upon admission, her primary diagnosis was noted as "bipolar I disorder, most recent episode mixed, severe, with psychotic features." Her GAF upon admission was rated at 25-30, and she was given Haldol and Ativan for severe agitation.

-3-

On October 23, 2001, Plaintiff was transferred from Faith Regional Health Services to the Psychiatric Unit at NRC pursuant to a mental health board commitment from Pierce County, Nebraska. The admitting diagnosis was noted as "bipolar disorder most recently depressed with psychotic features," and her GAF upon admission was estimated to be within the range of 41-50. During her hospitalization she was treated with a combination of psychotropic medication with the dosages being adjusted as needed.

Upon her discharge on December 10, 2001, Plaintiff's psychotropic medication regimen included Serzone, Depakote and Zyprexa. Her treatment plan upon discharge included following up with Diane Schumacher, PA-C, for individual counseling. Plaintiff's GAF was estimated to be between 71 and 80 at the time of her discharge.

Following this last hospitalization, Plaintiff has been treated in the Outpatient Program at NRC, with PA-C Schumacher providing counseling and with Dr. O'Neill and fellow staff psychiatrist Duane Sherwin, M.D. monitoring Plaintiff's psychotropic medications. According to Plaintiff, she never saw Dr. Sherwin once she began outpatient care in 2001.

The working diagnosis for the Plaintiff has been listed as either schizoaffective disorder or schizoaffective disorder, bipolar type. Doctors O'Neill and Sherwin have noted that the Plaintiff has been compliant with taking her medications despite an adverse side effect of considerable weight gain. Plaintiff's psychiatrists have mentioned in their progress notes that they were aware the Plaintiff was working part time. The progress notes indicate that when asked to work five days in a row she is extremely tired and unable to do anything

else. The psychiatrists mention in several progress notes that the plaintiff has to sleep excessively.

Plaintiff's treatment with Ms. Schumacher is documented in progress notes, which cover the period from January 2003, through September 2005. The progress notes are consistent over this time period. Plaintiff's mental status examination was never anything but unremarkable. She always reported that she was medication compliant and did not complain of symptoms related to her mental impairment. She reported on June 30, 2003, that her grandmother's death and funeral did not result in any exacerbation of symptoms, and she went to Texas to attend the funeral.

Plaintiff's husband was an alcoholic, which produced great stress in the marriage. After Plaintiff's discharge in December 2001, she was advised to attend Al-Anon support meetings, whether or not her husband went to Alcoholics Anonymous (AA) meetings.

The progress notes also show that Plaintiff continued to work as a cook at a local restaurant. While the number of hours she worked varied, she maintained this employment without any flare up of symptoms. On December 15, 2003, Plaintiff shared with Ms. Schumacher a letter from her employer that indicated Plaintiff's hours would be reduced in order to accommodate her through fewer hours and work at slower times. On April 5, 2004, however, Plaintiff reported that her hours were increased because her husband had lost his job.

On October 4, 2004, Plaintiff told Ms. Schumacher that she had been asked to work five days in a row. On January 3, 2005, Plaintiff reported that her employers were very tolerant of her difficulties with organization and felt they were supportive of her.

Ms. Schumacher's progress notes indicate that Plaintiff's medication regimen remained relatively stable and unchanged during this time. On June 27, 2005, Ms. Schumacher added Abilify, and this medication was beneficial. The only medication that caused problematic side effects was Zyprexa. When Plaintiff did not take this early enough in the evening, she complained of morning sedation the next day. On more than one occasion, Ms. Schumacher advised Plaintiff how to minimize these side effects, but Plaintiff was not very successful in implementing the recommended changes in her medication administration and sleep regimen.

The progress notes made by Ms. Schumacher after October 2004 generally reflect that Plaintiff was clean and neat in her appearance. Earlier notes occasionally described Plaintiff's appearance as "slightly disheveled." These progress notes include repeated entries that Plaintiff denied any symptoms of depression. On numerous occasions, the progress notes state that Plaintiff did not voice any comments suggesting feelings of hopelessness, helplessness, or thoughts of harm to herself or others. Nor did the Plaintiff complain of feelings of anxiety or panic. Several reports indicate there was no tearfulness noted by Plaintiff.

A consultative psychological examination of the Plaintiff was performed on March 5, 2004 by Barbara J. Sturgis, Ph.D. Dr. Sturgis noted that Plaintiff was 5 feet 10 inches tall

and was grossly obese at 300 pounds. Dr. Sturgis further noted that Plaintiff was cooperative; however, her answers were "very short, concrete answers with virtually no elaboration."

During the March 5, 2004 examination, Plaintiff reported that she lived in a trailer with her husband and 12 year old son, and she was currently working 20-25 hours a week as a cook in a restaurant where she had worked for many years. She further indicated that one of her main difficulties was a need to sleep way beyond what would be normal, as she was sleeping 12-14 hours a day. This factor affected her ability to get things done around the house and otherwise.

Upon examination and testing, Dr. Sturgis noted that Plaintiff appeared to be able to manage her activities of daily living despite her inordinate periods of sleep. Dr. Sturgis further noted that Plaintiff has been able to get her son up and off to school and herself to work on a regular basis, and has been able to maintain that part-time job steadily for a number of years. Plaintiff reported that she got along well with the people at her work but did not socialize much outside of her work contacts, in part because she and her husband had no money.

Dr. Sturgis noted some question as to Plaintiff's ability to adapt to changes in her environment in that she had lived in one town, Pierce, Nebraska, all her life. As to diagnosis, Dr. Sturgis noted that Plaintiff had a history of psychotic behavior on three different occasions, and that Plaintiff's three periods of inpatient psychiatric hospitalization followed

traumatic events in her life, i.e., the birth of her son in 1992; the death of her grandfather; and the events of the September 11th terrorist event in New York City.

Dr. Sturgis did not agree that Plaintiff showed mood swings consistent with bipolar disorder. Rather, she felt that Plaintiff had psychosis, complicated by depression, or depression that was complicated by psychotic problems at three different times.

Dr. Sturgis opined that Plaintiff was able to sustain concentration and attention needed for task completion, to understand and remember short and simple instructions, and to carry out short and simple instructions under ordinary supervision. Dr. Sturgis concluded that the Plaintiff is likely to maintain a stable life situation aside from times of specific stress if she stays on her medications.

On October 14, 2004, Ms. Schumacher assessed Plaintiff's mental functional limitations and capabilities. Dr. Sherwin, the supervising psychiatrist, endorsed this assessment. Plaintiff noted increased symptoms when working full time. Changes in sleep aggravated Plaintiff's condition in that the symptoms increase when Plaintiff has a reduced amount of sleep. Ms. Schumacher described a number of signs that Plaintiff exhibited, including, decreased energy, slowed thoughts, and a decreased desire to do daily activities. The "signs" identified by Ms. Schumacher were as blunted affect, depressed mood, fearfulness, poverty of thought, sedation, concrete thought processes, limited insight, and limited daily activities.

Ms. Schumacher opined that Plaintiff was "markedly limited" in the following abilities: understand and remember detailed instructions; carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation.

Ms. Schumacher rated Plaintiff as "not significantly limited" or "moderately limited" in all the other abilities listed on the form, which was prepared and provided to Ms. Schumacher by Plaintiff's attorney. The form defined a "moderate" limitation as occurring once a week, and a "marked" limitation as occurring twice or more per week.

Ms. Schumacher opined that Plaintiff could work from three to six hours a day, no more than three days a week.

Plaintiff appeared with counsel and testified during the administrative hearing conducted on July 21, 2005. She appeared by telephone, with counsel, at the supplemental hearing on December 12, 2005. Plaintiff stated that she graduated from high school. After graduation, she worked as a cook at a nursing home and at a restaurant.

Plaintiff testified that she was released from her most recent hospitalization in December 2001. Since that time, she was in outpatient treatment with Dr. Sherwin and Ms. Schumacher, who managed her medications. She had not seen Dr. Sherwin since she was

discharged from inpatient treatment. Ms. Schumacher gave Plaintiff her medications but provided no counseling.

Plaintiff had been working 28 to 30 hours per week. She did not think she could work full time because whenever they put her on for five days a week, she was very tired. She drove 15 miles to work each way.

Plaintiff denied having any difficulty in carrying out her normal household chores and other tasks for her family. She loaded the dishwasher and did the laundry as needed. During the school year, she got her son up in time to eat breakfast before school. Usually, Plaintiff took her son to school, although the neighbors would also give him a ride.

Once her son left, she went back to bed for a two-hour nap. If she were to work more hours, she would not see her son or her husband as much. She no longer had the time for hobbies, such as embroidery.

Plaintiff testified that she was five feet ten inches tall and weighed 319 pounds. When she got tired at work, she could sit down, if there was time. She got along well with her coworkers and did not usually have to deal with the customers. She received no complaints about her job performance.

Anita Howell testified as the impartial vocational expert. At the July 21, 2005 hearing, the ALJ asked Ms. Howell whether an individual of the same age, education, work experience, and residual functional capacity could perform any of Plaintiff's vocationally relevant past work. Ms. Howell testified that the jobs of cook, as Plaintiff performed it, and

cashier-checker were consistent with the hypothetical question. If Plaintiff could not work full-time, as indicted by Ms. Schumacher's assessment, there was no other work available for her in the national economy.

At the supplemental hearing held December 12, 2005, Ms. Howell acknowledged that, in light of Plaintiff's amendment of her alleged onset date to February 7, 2002, it was no longer appropriate to include the job of cashier-checker as vocationally relevant past work. Plaintiff's past work as a cook was light and semi-skilled. Because the ALJ's hypothetical question restricted Plaintiff to unskilled work, Plaintiff could not perform this job.

According to Ms. Howell, there was other unskilled work available in significant numbers for the individual described in the hypothetical question. Examples of such work included the medium jobs of industrial janitor, dining room attendant, sandwich maker, and dishwasher and the light jobs of housekeeping/cleaner, marker, and inspector/packager. Despite Plaintiff's nonexertional limitations, 55 to 60 percent of unskilled work at the sedentary to medium levels of exertion remained available to her.

### III. ALJ's FINDINGS AND DECISION

The ALJ made the following findings:

1.  Plaintiff met the insured status requirements of Title II of the Act on her alleged disability onset date of February 7, 2002, and continued to meet them through December 31, 2007.

2. Plaintiff had not engaged in "substantial gainful activity"[1] since February 7, 2002.

3. The medical evidence established that Plaintiff had the following severe impairments under the Act and Regulations: schizoaffective bipolar disorder and obesity. Plaintiff did not have an impairment or combination of impairments meeting or medically equal to any listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

4. Plaintiff's allegation of an inability to work 40 hours per week on a sustained basis was not credible.

5. Plaintiff has the residual functional capacity to work at the sedentary to light exertion level, but with the following nonexertional limitations: moderately limited in the ability to handle detailed work; can only perform routine, unskilled repetitive work classified at Specific Vocational Preparation (SVP) levels 1 or 2; work cannot require her to set goals or deal with job changes; only occasional social interaction with coworkers, supervisors or the general public.

6. Plaintiff was unable to perform her sole past relevant work as a cook.

7. Plaintiff's age has ranged from 38-42 years old, which is defined in the Regulations as a "younger person." 20 C.F.R. §§ 404.1563(c) & 416.963(c)).

8. Plaintiff has a high school education.

9. Based on the testimony of the vocational expert, Plaintiff could perform 55-60% of the following unskilled jobs at a skill level of SVP 2 or below existing in the national

---

[1] *See generally* 20 C.F.R. §§ 404.1571 through 404.1574 (DIB); 20 C.F.R. §§ 416.971 through 416.974 (SSI).

economy that such an individual can perform, such as housekeeping cleaner, marker, inspector/packager, or sandwich maker.

10. Based on the testimony of the vocational expert, the Plaintiff is not disabled.

11. The Plaintiff has not been under a "disability," as defined in the Act, at any relevant time.

Accordingly, the ALJ found that Plaintiff was not entitled to a period of disability or disability insurance benefits and was not eligible for SSI benefits under the Social Security Act.

## IV. ERRORS ALLEGED

In this proceeding, Plaintiff contends that the ALJ's findings of fact are not supported by substantial evidence on the record as a whole in the following respects:

1. The ALJ failed to accept as controlling the limitations and restrictions placed upon the Plaintiff by her treating physician, Dr. Sherwin, pursuant to Social Security Ruling 96-2p.

2. Even if the opinions of the treating source were not entitled to controlling weight, the ALJ failed to give substantial weight to the opinions of Dr. Sherwin, based on his examining relationship, his treatment relationship (as to length of treatment, frequency of treatment and the nature of the treatment), the supportability of his opinions and their consistency with the record as a whole.

3. The ALJ failed to give the opinions of Ms. Schumacher, PA-C[2] weight based on her examining relationship, her expertise related to the plaintiff's impairment, the supportability of her opinions and their consistency with the record as a whole as required by Social Security Ruling 06-03.

## V. LEGAL ANALYSIS

### 1. *Standard of Review*

The ALJ's decision, which stands as the final decision of the Commissioner, must be affirmed if it is supported by substantial evidence in the record as a whole. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" *Id.* (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). The court must consider the entire record, including evidence that supports as well as detracts from the Commissioner's decision. The court cannot reverse the Commissioner's decision simply because some evidence may support the opposite conclusion. *Id. See also Robson v. Astrue*, 526 F.3d 389 (8th Cir. 2008); *McEvers v. Astrue*, 518 F. Supp. 2d 1071 (S.D. Iowa 2007).

### 2. *The Five-Step Sequential Evaluation Process*

Under the Social Security Act, the claimant must prove that he or she is disabled, that is, unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

---

[2] Plaintiff acknowledges that Ms. Schumacher is not considered an "acceptable medical source" under Social Security rules and regulations.

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d). The regulations promulgated by the Commissioner of Social Security, *i.e.*, 20 C.F.R. § 416.920(a)(4), establish a five-step sequential evaluation process the ALJ must follow in a disability case. *See, e.g., Robson v. Astrue*, 526 F.3d 389, 391 (8th Cir. 2008). The claimant bears the burden of proof in the first four steps.

Under the Social Security Act, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d). Further,

> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.
>
> (B) In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the

combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. 423(d)(2)

In deciding whether a claimant is disabled, the ALJ must follow a five-step sequential evaluation process, considering: (1) the claimant's work activity, if any; (2) the medical severity of the impairment; (3) whether the medical severity of the impairment equals one of the listings in Appendix 1 of Chapter III, Part 404, Subpart P[3]; (4) the claimant's residual functional capacity (RFC) and past relevant work; and (5) whether the claimant can perform other jobs in the economy given the claimant's RFC, age, education, and work experience. *See Robson v. Astrue*, 526 F.3d 389 (8th Cir. 2008).

The court finds that the ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520[4] and 416.920 to determine whether the plaintiff was disabled.

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1

[4] 20 C.F.R. § 404.1520(a) provides:

(4) **The five-step sequential evaluation process.** The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. Before we go from step three to step four, we assess your residual functional capacity.... We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps. These are the five steps we follow:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.... (See paragraph (b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and

In this instance, the Plaintiff argues that the ALJ should have given controlling or substantial weight to the conclusions of Dr. Sherwin and Diane Schumacher, PA-C. Under the Regulations, the ALJ must determine the weight to give a particular sources testimony based on a set of criteria: whether there was an examining or treating relationship; the length, frequency and nature of any treatment; whether the medical opinions are supported by objective and other evidence; the consistency of the medical opinion with the record as a whole; and medical specialization of the doctor giving the opinion. 20 C.F.R. § 404.1527(d); SSR 96-2p. "A treating physician's medical opinion is given controlling weight if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence[5] in [the] case record.'"

---

    meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

    (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 404.1560(b).)

    (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 404.1560(c).)

The provisions of 20 C.F.R. § 920(a)(4) are virtually identical to those of § 404.1520(a).

[5]Social Security Ruling 96-2p advises:

Depending upon the facts of a given case, any kind of medical or nonmedical evidence can potentially satisfy the substantial evidence test. For example, a treating source's medical opinion on what an individual can still do despite his or her impairment(s) will not be entitled to controlling weight if substantial, nonmedical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion. The converse is also true: Substantial evidence may demonstrate that an individual's ability to function may be less than what is indicated in a treating source's opinion, in which case the opinion will also not be entitled to controlling weight.
SSR 96-2P, 1996 WL 374188 (July 2, 1996).

*Choate v. Barnhart*, 457 F.3d 865, 869 (8th Cir. 2006) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)); *see Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008). "[The court] will uphold an ALJ's decision to discount or even disregard the opinion of a treating physician where 'other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Choate*, 457 F.3d at 869 (quoting *Reed v. Barnhart*, 399 F.3d 917, 920-21 (8th Cir. 2005)). Further, "a treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements." *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir.2004). Specifically, the ALJ may discount medical opinions regarding limitations which are at odds with the same medical source's progress notes and unsupported by medically acceptable data. *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (regarding treating therapist as "other medical source"); *Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004). However, the regulations require "that the [ALJ] will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s)." SSR 96-2p; *see* 20 C.F.R. § 404.1527(d)(2).

In her decision, the ALJ discussed in detail the Plaintiff's medical history, the diagnoses and opinions of her treating physicians, and the consultative psychological

-18-

examination performed March 5, 2004 by Dr. Sturgis. The ALJ articulated the following reasons for according little weight to the opinions of Dr. Sherwin and PA-C Schumacher:

> After careful consideration of the entire record, the undersigned [ALJ] finds as follows regarding the claimant's functional limitations resulting from her mental impairments: in the area of activities of daily living, the claimant has a rating of none; in the area of social functioning, the claimant has a mild limitation of functioning; in the area of concentration, persistence, or pace, the claimant has a moderate degree of limitation; and in the area of episodes of decompensation, the claimant has a rating of none. The undersigned gives little weight to the opinions of PA-C Schumacher and Dr. Sherwin on this issue ..., as they are not supported by their own treatment notes or by the other evidence in the record as a whole, including the claimant's testimony. For example, there is no [sic] absolutely no basis to say that the claimant has a marked limitation in the travel/transportation area since the evidence shows that she drives herself every day to and from her workplace that is about 40 miles away in another town.... The undersigned believes that the physician assistant and Dr. Sherwin obviously did not understand the definitions on the form. Claimant's employer rates claimant's ability to attend and concentrate and attend as satisfactory; that she can relate with others satisfactorily–this is considered more probative tha[n] the checklist estimation of her ability to relate with others and handle unskilled tasks.

\* \* \* \*

> After carefully considering all the evidence of record in light of the Polaski[6] credibility factors..., the undersigned finds that the claimants allegation of an inability to work for 40 hours a week on a sustained basis is not credible. The claimant has a long and steady work history, much of which has been since she developed her mental illness in 1992. She worked for many years at the level of substantial gainful activity (from 1993 through 2001) before she decreased her work hours to squeak by just under the level of substantial gainful activity during the period being adjudicated. There are a lot of vague progress notes from PA-C Schumacher, who has stated an opinion that the claimant can work 28 hours a week, but not 40. The claimant's activities of daily living are very good, as she has worked for 28-30 hours a week for approximately 3 years by driving herself to and from her workplace that is about 40 miles from her

---

[6]*Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

> home. The claimant testified in the initial hearing that she gets along well with coworkers and the general public. **She has not actually seen a psychiatrist for many years, and has been maintained by a physician assistant** (although the undersigned acknowledges that Dr. Sherwin has signed off on PA-C Schumacher's progress notes and other documents).

(Tr. 19-20, emphasis added).

The court has reviewed and considered the entire record in this matter and finds that the ALJ's decision (which stands as the final decision of the Commissioner) is supported by substantial evidence in the record as a whole. Specifically, the decision not to afford controlling weight to the opinions of Plaintiff's mental health care providers is consistent with the Regulations and is supported by substantial evidence.

## VI. CONCLUSION

The plaintiff was given a fair hearing and full administrative consideration in accordance with applicable statutes and regulations. For the reasons discussed above, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

**DATED January 15, 2009.**

BY THE COURT:

s/ F.A. Gossett
**United States Magistrate Judge**